IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JOSEPH NJUGUNA NJONGE,

        Petitioner,

        v.

SUPERINTENDENT MARGARET
GILBERT,

        Respondent.

Case No. C17-1035 RSM

ORDER DENYING PLAINTIFF'S
PETITION FOR WRIT OF HABEAS

## I. INTRODUCTION

This matter comes before the Court on a petition for habeas relief and a Report and Recommendation prepared in response to that petition. Dkts. #4 and #19. Petitioner, Joseph Njuguna Njonge, argues that King County Superior Court Judge Laura Middaugh violated his right to a public trial by closing a portion of *voir dire* to the public. Specifically, that Judge Middaugh excluded Petitioner's family, friends, and supporters from the courtroom without conducting the on record analysis required to permit a closure. Petitioner also argues that the failure of his attorney to object to the closure at trial amounted to ineffective assistance of counsel. Magistrate Judge Tsuchida completed a Report and Recommendation regarding Petitioner's first independent public trial right claim, and, without reaching the merits of other claims, recommended that Petitioner's conviction be vacated and a new trial be granted.

ORDER– 1

For the reasons stated herein, the Court denies Petitioner's request for habeas relief on Claims 1, 2, and 3.

## II. BACKGROUND

Mr. Njonge was charged with the first degree murder of Jane Britt. Dkt. #4-2 at 4. During a pretrial suppression hearing, on June 2, 2009, after being asked whether members of Petitioner's family would be able to attend *voir dire*, Judge Middaugh responded:

> [W]e are in very cramped quarters for jury selection, and I think about the only place for visitors to sit is going to be the little anteroom out there, and I will tell you, with what we are going to do about trying to get enough just to do this in one meeting.

Dkt. #4-3 at 17.

Judge Middaugh went on to explain how she intended to conduct *voir dire* in accordance with her concerns about seating. *Id*. She stated that after completing jury biographies and questionnaires, the entire panel would be called to the courtroom, noting "[w]e have received permission to get more than the standard 50. I think we are getting 65." Dkt. #4-2 at 5. The maximum occupancy of the courtroom at that time was 49 persons. *Id*. at 132. Judge Middaugh ordered that the first two benches in the courtroom were to remain clear for the duration of jury selection. *Id*. at 19. Then, addressing members of the public present, she stated:

> Just let me say for the people who are observing. You are certainly welcome to observe. Tomorrow when we have the jury selection, there will not be room for all of you. What we are going to do to allow people to observe is check with the fire marshal […] and make sure that we can keep those first swinging doors open. And if we can do that, then we will allow some people to observe if they wish to do so during the jury selection by sitting in that kind of entry hall, if we can do that…We may be able to have chairs out there; we may not. We may be able to have the doors open without chairs. We are going to find that out. *The chance of all you being able to be here and observe are slim to none during the jury selection process.*

*Id*. at 5 (emphasis added).

Prior to jury selection the following day, the fire marshal declined the court's request to have the doors remain open. *Id*. at 6. On the morning of June 3, 2009, members of the public including Ann Njonge, Petitioner's sister, and Evelyn Thuo, a family friend, arrived to view the jury selection process. Dkts. #4-2 at 135–37 and #4-3 at 2. Potential jurors were brought up shortly after 9:00 a.m., ushered into the courtroom, and the doors were then closed. *Id*. Both Ms. Njonge and Ms. Thuo confirmed that they were unable to observe jury selection from the entry hall, and that no members of the public were allowed into the courtroom until after the noon recess. *Id*. In his own affidavit, Mr. Njonge stated that during the jury selection process that morning "the only people in the courtroom were the Judge, the bailiff, the court clerk, the stenographer, my lawyer, the prosecutor and a detective, the courtroom doors were closed after the jurors were brought in, and no observers were allowed in…." Dkt. #4-3 at 6.

Once the *venire* had entered, Judge Middaugh welcomed the jurors, explained the importance of jury duty and the jury selection process, and swore in the potential jurors. *Id*. at 17–18. Judge Middaugh then proceeded to discuss the charge against Mr. Njonge and the State's burden of proof. Dkt. #4-2 at 38–39. Six jurors had indicated on their questionnaire that they would not be able to remain impartial, and thirty-four indicated potential hardship concerns. Dkts. #4-2 at 38 and #4-3 at 20. The Judge then questioned the jurors who had asked to be excused for hardship reasons. Dkt. #4-2 at 38. One juror stated to the court "I lived in Indonesia for a couple of years and that society in dealing with persecution and the suppression of women and this whole situation, this whole case is going to be very disturbing

for me." *Id*. at 39. Around 12:00 p.m., the court excused the *venire* for lunch. *Id*. Judge Middaugh remained on the bench, discussing potential hardship excusals with the attorneys. Dkt. #4-3 at 20. Seventeen potential jurors were excused for hardship reasons. *Id*. at 14.

At the beginning of the afternoon session, the prosecuting attorney informed the court that some non-witness members of the public had "stuck around this morning, hoping there might be some seats later, and your bailiff informed them at lunch since some people were excused there were some." Dkt. #4-2 at 20. The prosecutor suggested moving a potential juror to another seat to accommodate members of the public. *Id*. Judge Middaugh approved, commenting "[w]e checked with the fire department. They wouldn't let us leave the doors open for visitors to come in. Let's move No. 30 over next to 34, and then we can have visitors sitting in the second row there." *Id*. Jury selection then continued as the parties began questioning jurors. *Id*. Importantly, no party objected to the trial court's treatment of *voir dire*. *Id*.

Mr. Njonge was convicted of second degree murder at the conclusion of his trial. *Id*. at 6. Mr. Njonge appealed to the Washington State Court of Appeals, alleging for the first time that his right to a public trial had been violated when Judge Middaugh closed the court during *voir dire*. *Id*. The State Court of Appeals agreed with Mr. Njonge and remanded for a new trial. *Id*. at 16. The State appealed, and the Washington State Supreme Court reversed after concluding that the record did not provide adequate evidence that members of the public had been "totally excluded from the juror excusals." *Id*. at 18–19 and 23.

Mr. Njonge then initiated personal restraint proceedings, and provided new evidence supporting his assertion that the courtroom doors were closed and members of the public were totally excluded for the duration of the morning jury selection process. Dkts. #4-2 at

113, 118–19, and 134–37 and #4-3 at 2–3. The Washington State Court of Appeals denied his personal restraint petition, finding that the right to a public trial did not include hardship excusals, and that Mr. Njonge had not made a required showing of prejudice. Dkt. #4-3 at 21–23.

On review, the Washington State Supreme Court acknowledged that Mr. Njonge's new evidence created "an important distinction in light of this court's determination on direct appeal that the record on appeal did not show that the courtroom was closed in violation of the right to a public trial." *Id*. at 47–48. After consideration of the new evidence, the State Supreme Court reasoned that hardship excusals were distinct from "substantive jury voir dire," and that it was questionable whether a lack of public access during that portion implicated Mr. Njonge's public trial right. *Id*. at 48. Even assuming the hardship excusals did implicate Mr. Njonge's public trial right, the Washington State Supreme Court denied his petition, concluding that he had not presented a basis for relief by failing to establish that he was prejudiced by any closure. *Id*. at 48–50.

### III. EVIDENTIARY HEARING

As an initial matter, this Court agrees with the Magistrate Judge's findings regarding Petitioner's request for an evidentiary hearing. *See* Dkt. #19 at 10. Petitioner has alleged facts with respect to the closure of his trial, which if proven, may entitle him to relief. However, Petitioner has not established that the hearings he previously received in state court were neither full nor fair. Thus, the Court finds that holding an evidentiary hearing in this matter is not necessary at this time.

# IV. DISCUSSION

## A. Standard of Review

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a federal court is unable to grant relief on an application for a writ of habeas corpus with respect to any claim that was adjudicated on the merits unless the adjudication of the claim resulted in a decision that was (1) contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) based on an unreasonable determination of the facts in light of the evidence presented in state court proceedings ." 28 U.S.C. § 2254(d).

A state court's decision is "contrary to" federal law when the court either (1) failed to apply the correct controlling authority, or (2) having applied the correct controlling authority, did so in a case involving facts "materially indistinguishable" from those in a controlling case, but nonetheless reached a different result. *See Shackleford v. Hubbard*, 234 F.3d 1072, 1077 (9th Cir. 2000), *cert. denied*, 534 U.S. 944, 122 S. Ct. 324, 151 L. Ed. 2d 242 (2001) (quoting *Williams v. Taylor*, 529 U.S. 362, 404–406, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)).

Alternatively, a state court decision is an unreasonable application of federal law when it is "objectively unreasonable." *See Williams*, 529 U.S. at 408–09. "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *White v. Woodall*, 134 S. Ct. 1697, 1702, 188 L. Ed. 2d 698

(2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 101–103, 131 S. Ct. 770, 786–787, 178 L. Ed. 2d 624 (2011)).

In evaluating whether a state court decision was based upon an unreasonable determination of facts in light of the evidence, it is presumed that the state court factual findings are correct. 28 U.S.C. § 2254(e)(1). A federal court is unable to overturn state court findings of fact unless it has "clear and convincing evidence" that those findings are "objectively unreasonable." *See Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003).

To determine whether the State court decision was contrary to, or involved an unreasonable application of, federal law, or involved an unreasonable determination of facts, this Court must base its judgment on the State court's last reasoned decision addressing the merits of the claims raised in the habeas petition. *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002) (referencing *Ylst v. Nunnemaker*, 501 U.S. 797, 803–04, 111 S. Ct. 2590, 115 L. Ed. 2d 706 (1991)); *see also Shackleford*, 234 F.3d at 1079.

The last reasoned state court decisions in this case are the Washington State Supreme Court's en banc denial of Petitioner's direct appeal, and its denial of discretionary review of Petitioner's personal restraint petition. Dkts. #4-2 at 19–28, #4-3 at 46–50 and #19 at 9. By identifying and discussing the merits of Petitioner's claims, these orders qualify as "reasoned decisions," and will serve as the basis of this Court's evaluation of the instant matter. 28 U.S.C. § 2254(d)(1); *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004).

**B. Claim 1** – **Violation of the Public Trial Right, Exclusion of the Public**

In Claim 1, Petitioner asserts that his right to a public trial was violated when the trial court closed a portion of *voir dire* to his family and friends. Dkt. #4-1 at 3. Petitioner's trial

counsel did not object to the closure at trial, and the claim was brought first on direct appeal. Dkt. #4-2 at 4–6.

*1. Did Petitioner's Failure to Object to the Closure of his Trial at Voir Dire Waive his Right to a Public Trial?*

Under federal law, a defendant in a federal criminal trial may be found to have waived his or her right to a public trial by failing to object to the closure of *voir dire* proceedings. *Peretz v. United States*, 501 U.S. 923, 936, 111 S. Ct. 2661, 2669, 115 L. Ed. 2d 808 (1991). However, in evaluating Petitioner's claim, this Court must rely on the last reasoned decision on the merits, which was made under Washington State law, not federal law. *Lambert*, 393 F.3d at 969. The Washington State Supreme Court rejected Respondent's claim that Petitioner's failure to object amounted to a waiver, citing well-settled Washington State law permitting a public trial right claim to be raised for the first time on direct appeal. Dkt. #4-2 at 22 (citing *State v. Bone-Club*, 128 Wn.2d 254, 257, 906 P.2d 325 (1995)).

In determining whether a petitioner waived his or her right to a public trial, the United States Supreme court has held that it "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729–30, 111 S. Ct. 2546, 2553–54, 115 L. Ed. 2d 640 (1991), *holding modified by Martinez v. Ryan*, 566 U.S. 1, 132 S. Ct. 1309, 182 L. Ed. 2d 272 (2012) (referencing *Fox Film Corp. v. Muller*, 296 U.S. 207, 210, 56 S. Ct. 183, 184, 80 L. Ed. 158 (1935)). This "independent and adequate state ground" doctrine applies regardless of whether the state law is substantive or procedural. *Id*.

Functionally, the doctrine serves to bar federal review of petitioner's habeas claims when the underlying state court was initially barred from addressing them on state procedural grounds. *Id*. The current application of the independent and adequate state ground doctrine is intended to address concerns over comity and federalism by respecting state procedure in federal courts. *Id*. at 730.

The first issue in the present case is whether this Court may review Petitioner's public trial right claim when it was permissibly raised under Washington State law, but would be barred if raised in federal court as having been waived under federal law. The Supreme Court of the United States' treatment of the issue raised in *Cnty. Ct. of Ulster Cnty., N. Y. v. Allen*, 442 U.S. 140, 99 S. Ct. 2213, 60 L. Ed. 2d 777 (1979), is informative to this Court's analysis. In *Ulster County*, the Court reviewed whether a federal district court had jurisdiction to hear a habeas claim when the petitioner had failed to object at trial regarding the issue. *Ulster County*, 442 U.S. at 147–49. The Court held that the petitioner's claim was not barred by a state procedural requirement and could be reviewed, both noting that New York "has no clear contemporaneous-objection policy that applies in this case," and relying upon three aspects of the record. *Id*. at 150–52. Those three aspects were that: (1) neither party alleged any procedural default about the timing of the claim, (2) the appeals court impliedly held there was no procedural default by addressing the merits of the claim, and (3) the appeals court denied the claim solely based upon its merits, with no reliance on a procedural default in its holding. *Id*. at 152–54.

The *Ulster County* court recognized that the purpose of the "independent and adequate state ground" is to respect the sovereignty of a state's application of their procedural laws in the federal system. *Id*. at 154. However, when "neither the state

ORDER– 9

legislature nor the state courts indicate that a federal constitutional claim is barred by some state procedural rule, a federal court implies no disrespect for the State by entertaining the claim." *Id*.

The same principles of federalism and comity that are elucidated upon in *Coleman* and *Ulster County* are present in the instant matter. In its order denying Petitioner's personal restraint petition, the Washington State Supreme Court relied upon the same factors as the New York trial court did in *Ulster County*. Both courts first acknowledged that state procedural practice allowed the claim at issue to be brought independently without requiring any objection at trial. *See Ulster County*, 442 U.S. at 148; Dkt. #4-3 at 46–47. In *Ulster County*, the United States Supreme Court noted that neither party raised a procedural default issue, while in the instant case, not only was that issue raised by Respondent, but it was rejected by the State Supreme Court's holding on direct appeal. 442 U.S. at 152; Dkt. #4-2 at 9. Additionally, both the *Ulster County* trial court and Washington State Supreme Court impliedly accepted the lack of procedural default by directly addressing the merits of the claim, and then basing their determination on the merits alone. 442 U.S. at 152–53; Dkt. #4-3 at 46–50.

As such, Petitioner's independent public trial claim was not barred by any Washington State procedural rule, and in the interests of federalism and comity this Court may entertain that claim on habeas review. The Court finds Petitioner has not waived his right to public trial for the purposes of habeas review, and reviews the merits of his claim.

*2. Was Petitioner's Right to a Public Trial Violated?*

This Court must next consider whether the Washington State Supreme Court's decision was: (1) contrary to federal law, or (2) involved an unreasonable application of

clearly established federal law. *See Shackleford*, 234 F.3d at 1077. The right to a public trial

applies to *voir dire*, and is extended to the defendant through the Sixth Amendment. *Presley*

*v. Georgia*, U.S. 209, 213, 130 S. Ct. 721, 723, 175 L. Ed. 2d 675 (2010). Under the public

trial right *voir dire* must remain open to the public, except in the rare circumstance where

competing interests arise that would justify closure. *Id*. Should a federal district court seek to

close a trial, it must apply the standards set forth in *Waller v. Georgia*:

> "[T]he party seeking to close the hearing must advance an overriding interest
> that is likely to be prejudiced, the closure must be no broader than necessary
> to protect that interest, the trial court must consider reasonable alternatives to
> closing the proceeding, and it must make findings adequate to support the
> closure."

*Waller v. Georgia*, 467 U.S. 39, 48, 104 S. Ct. 2210, 2215, 81 L. Ed. 2d 31 (1984).

A nearly identical process is followed by Washington State courts in evaluating

whether a state trial may be closed:

> "To assure careful, case-by-case analysis of a closure motion, the trial court
> must perform a weighing test consisting of five criteria:
> 1. The proponent of closure or sealing must make some showing [of a
> compelling interest], and where that need is based on a right other than an
> accused's right to a fair trial, the proponent must show a "serious and
> imminent threat" to that right.
> 2. Anyone present when the closure motion is made must be given an
> opportunity to object to the closure.
> 3. The proposed method for curtailing open access must be the least restrictive
> means available for protecting the threatened interests.
> 4. The court must weigh the competing interests of the proponent of closure
> and the public.
> 5. The order must be no broader in its application or duration than necessary
> to serve its purpose."

*State v. Bone-Club*, 128 Wn.2d at 258–59 (all bracketing original).

Both federal and Washington State courts have concluded that the failure to conduct a

*Waller/Bone-Club* analysis, on the record, and regarding the respective factors necessary to

close *voir dire*, constitutes a violation of the defendant's right to a public trial. *See Presley*, 558 U.S. at 215 (finding trial court's exclusion of public from *voir dire* due to overcrowding, and failure to consider alternatives such as reserving space for public in courtroom, dividing jury *venire* to reduce courtroom congestion, and instructing potential jurors to not engage with members of the public, amounted to violation of right to public trial); *see also In re Orange*, 152 Wn.2d 795, 809, 100 P.3d 291 (2004) (holding that trial court's exclusion of public from overcrowded jury selection without engaging in full *Bone-Club* analysis was violation of defendant's right to public trial under Washington State law).

In making its determination, the Washington State Supreme Court considered the record surrounding Judge Middaugh's treatment of *voir dire* at Petitioner's trial, and concluded as follows:

> Mr. Njonge specifically claims that members of his family and friends were unable to enter the crowded courtroom on the morning of June 3, 2009. At that time, the trial court considered hardship excusals among the entire jury venire. Substantive jury voir dire occurred during the afternoon session. Mr. Njonge does not assert his supporters were unable to attend the afternoon session.

> Assuming Mr. Njonge's factual allegations are true (which I need not decide), it is questionable whether lack of access to the courtroom during preliminary excusals for hardship implicates the right to a public trial. *See State v. Russell,* 183 Wn.2d 720, 730-31, 357 P.3d 38 (2015) (work sessions where the trial judge, counsel, and defendant met in jury room to go over jury questionnaires for potential hardship excusals did not implicate right to public trial); *State v. Wilson,* 174 Wn. App. 328, 342, 298 P.3d 148 (2013), *review denied,* 184 Wn.2d 1026 (2016) (hardship excusals historically do not implicate public trial right). But even if limited public access to the preliminary hardship excusal phase implicated Mr. Njonge's right to a public trial, he is now asserting the violation as a freestanding claim on collateral review. He therefore must establish that any violation prejudiced him....Mr. Njonge fails to show any prejudice.

Dkt. #4-3 at 48 (all bracketing original).

ORDER– 12

Even accepting the truth of Petitioner's factual allegations, the Washington State Supreme Court concluded that his right to public trial had not been violated based on two conclusions: (1) that lack of access to hardship excusals does not implicate the right to a public trial, and (2) that even if access to hardship excusals does implicate the right to a public trial, Petitioner is now bringing the claim on collateral review and has not shown prejudice resulting from the closure. *Id*. Both contentions are contrary to, and an unreasonable application of, federal law.

First, the Washington State Supreme Court found "it is questionable whether lack of access to the courtroom during preliminary excusals for hardship implicates the right to a public trial." *Id*. (citing *State v. Russell*, 183 Wn.2d 720, 730–31, 357 P.3d 38 (2015)). In *Russell*, the State Supreme Court held that the public trial right does not apply to hardship excusals, because "[d]etermining whether a juror is able to serve at a particular *time* or for a particular *duration* (as in hardship and administrative excusals) is qualitatively different from challenging a juror's ability to serve as a neutral factfinder in a particular *case* (as in peremptory and for-cause challenges)." 183 Wn.2d at 730–31. The application of *Russell* to the present case is unpersuasive, as this Court views whether the Washington State Supreme Court's last reasoned decision was contrary to, or an unreasonable application of, *federal* not state law. *Shackleford*, 234 F.3d at 1077 (emphasis added).

The United States Supreme Court holding in *Presley* drew no distinctions between "hardship" excusals and substantive *voir dire* in determining whether the right to public trial applied. 558 U.S. at 213–15. In *Presley*, the trial court closed jury selection to the public in order to accommodate a large *venire*, prior to either hardship or substantive *voir dire* taking

place, and without engaging in a *Waller* analysis.[1] *Id.* at 210–16. In its opinion in *Presley*, the Supreme Court stated, without qualification, that the right to public trial was violated when the court did not conduct a *Waller* analysis prior to closing, regardless of whether hardship or substantive *voir dire* was taking place. 558 U.S. at 213, 216 ("[E]ven assuming, *arguendo,* that the trial court had an overriding interest in closing *voir dire,* it was still incumbent upon it to consider all reasonable alternatives to closure. It did not, and that is all this Court needs to decide").

In this case, the Washington State Supreme Court both failed to apply *Presley*, and in a situation with nearly identical material facts, reached the opposite outcome. 558 U.S. at 210–16; Dkts. #4-2 at 5–6, 19, and 134–37 and #4-3 at 2–12. The State Supreme Court's error regarding well-settled federal law places its decision beyond the scope of any "fairminded disagreement," and it is therefore an unreasonable application of the law. *See Williams*, 529 U.S. at 404–406; *see also Woodall*, 134 S. Ct. at 1702.

The Washington State Supreme Court's second conclusion, that Petitioner is not entitled to relief because he did not establish that he was prejudiced by any closure of the trial, is equally unpersuasive. As far back as the United States Supreme Court's holding in *Waller*, it has been consistently held that "[a] defendant should not be required to prove specific prejudice in order to obtain relief for a violation of the public-trial guarantee." 467

---

[1]  The Court's holding in *Presley* was reiterated in *Weaver v. Massachusetts*, 137 S. Ct. 1899, 1909–10, 198 L. Ed. 2d 420 (2017), as a clearly established federal precedent, however, as the Washington State Supreme Court entered its judgement on April 5, 2017, and *Weaver* was not decided until June 22, 2017, the *Weaver* holding is not binding authority on this Court in assessing Petitioner's habeas claim. *Greene v. Fisher*, 565 U.S. 34, 38, 132 S. Ct. 38, 44, 181 L. Ed. 2d 336 (2011). "'[C]learly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the

U.S. at 49. Any burden to establish prejudice placed upon Petitioner, is unrelated to whether his right has been violated, and applies only to this Court's determination of whether he is entitled to relief under a claim of ineffective assistance of counsel.[2] *See Weaver*, 137 S. Ct. at 1910–11. The Washington State Supreme Court did not rely on either *Waller* or *Weaver* in supporting its determination, nor provide any indication of any "fairminded disagreement" as to why Petitioner must establish prejudice to support his free-standing public trial right claim. Dkt. #4-3 at 48–50.

In light of the conflict between federal law and the Washington State Supreme Court's determination, this Court finds that Petitioner's Sixth Amendment right to a public trial was violated.

*3. What is the appropriate remedy for the Violation of Petitioner's Public Trial Right?*

Having found that Petitioner's right to a public trial was violated, the next issue before this Court is determining a remedy that is "appropriate to the violation." *Waller*, 467 U.S. at 49–50. Appropriately crafting a remedy for a violation of the public trial right carries special significance, because a violation of that right is categorized as a "structural error." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 149, 126 S. Ct. 2557, 2564, 165 L. Ed. 2d 409 (2006). Constitutional violations are generally subject to a harmless error analysis to determine if a remedy is warranted. *Id*. at 148–49. However, because "structural errors" may

---

time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 1172, 155 L. Ed. 2d 144 (2003).
[2]  In its order, the Washington State Supreme Court does address Petitioner's ineffective assistance of counsel claim, but does so separate of its independent analysis of whether Petitioner had established prejudice associated solely with the closure of *voir dire* and his public trial right claim. Dkt. #4-3 at 48–50.

ORDER– 15

compromise the basic constitutional guarantees intended for criminal trials, they are not subject to the same harmless error test. *Id.*

As Petitioner did not waive his public trial right, his independent claim was appropriately brought on direct appeal and is before this Court as a structural error. If this Court were to mechanically apply the same approach as the Supreme Court in *Presley*[3], the appropriate remedy would be to reverse Petitioner's conviction and grant a new trial. *See* 558 U.S. at 213–16; *see also Presley v. State*, 307 Ga. App. 706, 707, 706 S.E.2d 103 (2011).

Unlike the petitioner in *Presley*, Petitioner in the instant matter did not object to the closure of *voir dire* at trial. *See* Dkt. #4-2 at 4–6; *see also Presley*, 558 U.S. at 210. The lack of an objection at trial places Petitioner's case into a legal grey area, and with no guiding precedent, this Court must turn to the factual situations and policy considerations of available case law.

Past and current Supreme Court precedent does not abide by the proposition that the sole remedy for a structural error is automatic reversal and a new trial. Thirty-four years ago, the Court in *Waller* first declared that a violation of the public trial right is a structural error, but in that same case explicitly declined to order a new trial as a remedy. *Waller*, 467 U.S. at 49–50. Instead, while recognizing a public trial right violation, the Court turned down the petitioner's request for a blanket grant of a new trial, stating such a remedy would be a "windfall for the defendant, and not in the public interest." *Id.*

---

[3] In *Presley*, the United States Supreme Court determined that a trial court had not conducted the prerequisite Waller analysis prior to closing *voir dire* over the objection of the defendant, resulting in a violation of the defendant's right to a public trial. *See* 558 U.S. at 213–16. As a remedy for that violation, the Court reversed the defendant's conviction, and remanded the matter to the trial court. *Id.* at 216.

The Court in *Weaver* shared the same reluctance to apply a new trial as an automatic remedy. In *Weaver*, the Court was confronted with a structural error raised in the context of an ineffective assistance of counsel claim, and far from following any rote remedy of granting reversal and a new trial, chose to issue no remedy at all. 137 S. Ct. at 1913–14. While the public trial right issue in *Weaver* was raised in the context of an ineffective assistance of counsel claim, and this Court is not bound by that decision, the lack of case precedent with an analogous fact pattern to the instant matter leads to this Court finding *Weaver* instructive.

That instructive value comes purely from *Weaver's* depiction of past precedent and elaboration of the policy concerns driving the Court's historical treatment of public trial right violations. *Id*. at 1907–13. For instance, the Court in *Weaver* describes the status of current precedent as reflecting that "in the case of a structural error where there is an objection at trial and the issue is raised on direct appeal, the defendant generally is entitled to 'automatic reversal' regardless of the error's actual 'effect on the outcome.'" *Id*. at 1910 (citing *Neder v. United States*, 527 U.S. 1, 7, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999)).

The policy considerations reflected in the *Weaver* Court's depictions of *Neder* are illuminating, as they draw attention both to the requirement of an "objection at trial," and that a defendant is only "generally" entitled to reversal. *Id*. As Petitioner did not object at trial, under a close reading of *Neder*, he would not qualify to be "generally" entitled to automatic reversal, much less the substantial remedy of a new trial. *Id*.

Another key issue is the ambiguity surrounding the Court's treatment of cases where the defendant did not object at trial. In both *Waller* and *Presley*, the Court goes out of its way to note that the defendant objected to the closure. *See Waller*, 467 U.S. at 47; *Presley*, 558

U.S. at 210 and 213. In *Weaver*, the Court addresses the importance of an objection at trial, stating that it allows the trial court to address the violation and conduct its reasoning on the record, gives an appellate court the immediate benefit of that complete record, cuts down on systemic costs involving evidence, and minimizes finality concerns. *Id*. at 1910–12. In contrast, when a defendant raises a public trial claim without objecting at trial, the trial court is deprived of the opportunity to either cure the violation or explain its reasoning for closure, and the systemic costs and finality concerns on later courts are greatly increased. *Id*. at 1911–12. The Court in *Weaver* notes that these concerns all stem from the failure to object at trial, and serve to justify its decision that lacking an objection at trial, a public trial right claim is more appropriately pursued via the higher scrutiny of an ineffective assistance of counsel claim. *Id*. at 1912–13.

As such, the appropriate standard for determining a remedy appears to fall into two categories: (1) those cases where there is an objection at trial, and a new trial will be generally granted as a matter of right, and (2) those where there is not an objection at trial, and the claim must be pursued via an ineffective assistance of counsel claim regarding the failure to lodge that objection. *Id*. at 1910–13.

In denying Petitioner relief on his independent public trial claim, this Court is not imposing a requirement that Petitioner prove any level of prejudice resulting from the closure of *voir dire* in order to prove a violation of that right. This Court simply holds that based upon the lack of objection to any closure at trial, Petitioner's public trial right claim is barred as an independent claim, and must be pursued via a claim of ineffective assistance of counsel for the failure to make that objection. Accordingly, this Court denies Petitioner's request for

ORDER– 18

1  relief under Claim 1, and will address potential remedies for a violation of the public trial

2  right under Claim 2.

3

4  **C. Claim 3 – Violation of the Public Trial Right, Exclusion of the Press**

5      In Claim 3, Petitioner argues that the trial court violated the public and press's First

6  Amendment right to a public trial, and by extension his own Sixth Amendment right, when it

7  closed the courtroom to the press for the duration of jury selection without first conducting a

8

9  *Waller* analysis. Dkt. #4-1 at 10.

10     Criminal trials have historically been open to the public and press as a means of

11  enhancing the integrity of the trial process, fostering an appearance of fairness, and allowing

12  the public to participate in, and serve as a check on, the judicial process. *Globe Newspaper*

13  *Co. v. Super. Ct. for Norfolk Cty.*, 457 U.S. 596, 605–06, 102 S. Ct. 2613, 2619–20, 73 L.

14

15  Ed. 2d 248 (1982). Then and now, the value of allowing open courtrooms comes from the

16  ability that openness has to protect the rights of the public, the press, and the accused. *Press–*

17

18  *Enter. Co. v. Super. Ct. of Cal., Riverside Cty.*, 464 U.S. 501, 508–510, 104 S. Ct. 819, 78 L.

19

20  Ed. 2d 629 (1984); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572–573, 100 S.

21  Ct. 2814, 65 L. Ed. 2d 973 (1980). To ensure these protections, the public and press hold a

22

23  First amendment right to attend a public trial, including the *voir dire* proceedings of that trial.

24  *See Presley*, 558 U.S. at 213; *see also Press-Enter. Co.*, 464 U.S. at 508-10.

25     That right, however, is not absolute. *Presley*, 558 U.S at 213. Under federal law,

26  before a trial may be closed, a federal district court must perform an analysis conveying its

27

28  justifications for closure in accordance with *Waller*, and described *supra* at Page 10–11.

29  *Waller*, 467 U.S. at 48; *Press-Enter. Co.*, 464 U.S. at 509–10. Current Washington State law,

30

also depicted above, mirrors the Supreme Court's standard set down in *Waller*. *See Bone-Club*, 128 Wn.2d at 258–59.

Prior to the beginning of *voir dire* at trial, the trial court instructed the public, and attorneys for each party, that:

> The other thing is as some of you who were here know that one of the TV stations wants to film the case…[a]nd I have no objection to them filming, but they did not ask my permission before they came into my courtroom with a camera, which is bad form. I have no objection to them filming, but they cannot during jury selection…[s]o, I told them they had to leave until after the jury selection.

Dkt. #15, Ex. 34 at 4.

The trial court then asked if either party wished to object, with no objection being raised by either the prosecution or defense counsel. *Id*. at 4-5. The last reasoned decision on the merits of this claim came when the State Supreme Court rejected Petitioner's claim, stating that the press was not actually excluded, just prevented from filming *voir dire*. Dkts. #4-2 at 25 and #15, Ex. 3 at 14–15.

Relying on its previous reasoning above, this Court finds that the closure of *voir dire* by the trial court, without first conducting a *Waller/Bone-Club* analysis, amounts to a violation of the public and press's right to a public trial, and by extension, Petitioner's right to a public trial. As a violation of the right to a public trial, this claim will be treated as a structural error, and not subject to harmless error review. *Weaver*, 137 S. Ct. at 1907. However, because Petitioner did not object to the violation at trial, this Court again concludes that the appropriate basis to raise this claim is under one of ineffective assistance of counsel.

//

ORDER– 20

**D. Claim 2 – Ineffective Assistance of Counsel**

In Claim 2, Petitioner argues that his trial counsel's failure to object to the closure of *voir dire* to the public and press amounted to ineffective assistance of counsel. Dkt. #4-1 at 7–9. For the reasons stated above, Petitioner's Claims 1 and 3 will be addressed under this Court's consideration of Claim 2.

Ineffective assistance of counsel claims are evaluated under the two-prong test established in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). This test asks whether (1) trial counsel's performance was so deficient it "fell below an objective standard of reasonableness," and (2) whether any deficient performance so prejudiced the defense that it deprived him of a right to a fair trial and caused the state court proceedings to be unreliable. *Strickland*, 466 U.S. at 686–87. Under the *Strickland* standard, a petitioner bears the burden of proving both prongs, and judicial scrutiny of trial counsel's performance is highly deferential. *Id*. at 689 and 697.

Petitioner's ineffective assistance of counsel claims stem from his trial counsel's failure to object to the trial court's closure of *voir dire* to the public and the press. Petitioner argues that the closure of *voir dire* to the public (Claim 1) and press (Claim 3) resulted in a violation of the right to a public trial under both the Sixth and First Amendments, respectively. Dkt. #4-1 at 10. Having found that the closure of *voir dire* did violate both Petitioner and the press's right to a public trial, it is up to this Court to now determine how to craft a remedy that is "appropriate to the violation." *Waller*, 467 U.S. at 49–50.

Even assuming that the failure of Petitioner's trial counsel to object is deficient performance under prong one of the *Strickland* test, Petitioner must still prove that he was prejudiced by the outcome. *See* 466 U.S. at 686–87. In the instant matter, this Court finds

that Petitioner has failed to meet his burden to show prejudice and therefore has failed to establish ineffective assistance of counsel.

Traditionally, a petitioner may prove prejudice by demonstrating a reasonable probability that, but for his trial counsel's deficient performance, a different outcome would have resulted. *Id*. at 694. However, in *Strickland*, the Court cautioned that the means of assessing whether a petitioner has proven prejudice is not to be applied in a formulaic fashion, and that the ultimate inquiry is whether he or she has established that the alleged deficient performance rendered the trial fundamentally unfair. *Id*. at 696. Assessing the effect a public trial right violation may have had on the fairness of a petitioner's trial is heavily influenced by that violation's status as a structural error. *Weaver*, 137 S. Ct. at 1907.

Structural errors are afforded their relatively unique immunity from harmless error analysis because they affect the very framework that is intended to ensure constitutional protections at trial. *Id*. at 149-50. There are three rationales for giving special protection to structural errors: (1) that it protects an interest of the defendant irrelevant to any harm relating to a violation, (2) that the effects of such an error are too difficult to measure, and (3) that the error always results in fundamental unfairness. *See Gonzalez-Lopez*, 548 U.S. at 149, n. 4; *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 824, 17 L. Ed. 2d 705 (1967); *Gideon v. Wainwright*, 372 U.S. 335, 343–345, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963).

Looking to the preference expressed by the Supreme Court for granting reversal and a new trial as a remedy for the violation of the public trial right, only the first two of these rationales appear relevant. First, the interest protected by the right is substantial, as it is held not only the by defendant, but by the press and general public as well. *Press-Enter. Co.*, 464 U.S. at 508–510. Second, the Court has consistently said the potential effects of a public trial

violation are simply too difficult to assess. *See Gonzalez-Lopez*, 548 U.S. at 149; *see also Waller*, 467 U.S. at 49.

In contrast, the third rationale of protecting against uniform unfairness resulting from any infringement on the right is not implicated, as the public trial right is subject to exceptions that limit that right. A trial may be closed in violation of the defendant's public trial right, provided simply that the trial court articulate a permissible basis under *Waller*. *See* 467 U.S. at 45. For instance, if a trial court errs by failing to put a *Waller* analysis on the record prior to closure, resulting in a public trial right violation, but no violation would have occurred and the closure would have been constitutionally permissible if it had done so, that error cannot be said to always result in fundamental unfairness. *See Presley*, 558 U.S. at 215.

A key influence on the *effects* such a violation may have had on the protected interests involved and fundamental fairness of the trial is whether a defendant objected to the closure at trial. When a defendant does not object, the trial court is deprived of the chance to make its record; that record is necessary to provide the *Waller* analysis used to address the validity of the closure and potential impact on the rights of the defendant, public, or press. *See Weaver*, 137 S. Ct. at 1910–12. Without an objection and clear record, an appellate court lacks the information necessary to grant a remedy before the indeterminable effects of that closure have further increased.

It is directly due to the difficulty of quantifying the effects of a public trial right violation, and the importance of a trial objection in addressing those effects, that Petitioner must bring that claim via one of ineffective assistance of counsel. In seeking to prove prejudice under *Strickland* for such a claim, Petitioner is afforded the option of proving

either (1) a reasonable probability that a different outcome would have resulted, or (2) that the error resulted in fundamental unfairness. *See* 466 U.S. at 694–96.

Petitioner has offered no substantive evidence or legal authority in support of the argument that, had his trial counsel objected to the closure, there is a reasonable probability that the trial would have resulted in a different outcome. Therefore, Petitioner has failed to establish his burden of proof under the standard application of prong two of the *Strickland* test. *See id*. at 694.

In light of the unique nature of the public trial right being a structural error, and the intertwined impact of that nature of that error on prong two of the *Strickland* analysis, it is now for this Court to determine whether the circumstances of his trial rendered it fundamentally unfair. After considering the Supreme Court's recent depiction of policy considerations underlying the public trial right, this Court notes that Petitioner's family and friends: (1) were excluded for roughly 3 hours of *voir dire*, (2) were allowed in for the remainder of *voir dire*, and (3) had access to all remaining phases of trial. Dkts. #4-2 at 134–37 and #4-3 at 2–12. In addition, a large *venire* witnessed the proceedings, the press was excluded for the duration of *voir dire*, and there has been no evidence of jurors lying or misconduct by either party or the court. Dkt. #4-2 at 5–6 and 19–20.

As noted, Petitioner failed to object to the closure at the time of trial, and members of the press failed to file any materials challenging their exclusion from the courtroom. *See id*. at 19–20. These omissions deprived the trial court an opportunity to remedy the violation or conduct its analysis on the record, and resulting in a substantial delay before the issue was raised before an appellate court and new evidence could be received. *Id*. In seeking the remedy of a new trial nearly ten years following the original conviction, it is highly likely

that both systemic costs and finality concerns have greatly increased. *See Weaver*, 137 S. Ct. at 1911–12. Finally, Petitioner has provided neither substantive evidence nor legal authority supporting that either the parties, the court, or the jurors engaged in any biased or improper behavior affecting the fairness of the determination.

Given all of the above, this Court finds that Petitioner has not established that his conviction resulted in fundamental unfairness, and denies Petitioner's claim of ineffective assistance of counsel.

## V. CONCLUSION

Having reviewed the Magistrate Judge's Report and Recommendation, the relevant pleadings, the Declarations and Exhibits attached thereto, and the remainder of the record, the Court ORDERS:

1. The Court DECLINES to adopt the Report and Recommendation.

2. Petitioner's petition for writ of Habeas Corpus, with regards to Claims 1, 2 and 3, is DENIED.

3. This matter is now CLOSED.

DATED this 11th day of April 2018.


RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE